**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| HEWLETT PACKARD ENTERPRISE COMPANY<br><br>Plaintiff,<br><br>v.<br><br>BRIAN WHEELER,<br><br>Defendant. | CASE NO.<br><br>**INJUNCTIVE RELIEF SOUGHT** |

**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF**
**FOR TRADE SECRET MISAPPROPRIATION**
**AND BREACH OF CONTRACT**

Hewlett Packard Enterprise Company ("HPE"), by and through its undersigned attorneys, brings this Verified Complaint against Brian Wheeler ("Mr. Wheeler"), seeking injunctive relief for trade secret misappropriation and breach of contract, and HPE alleges as follows:

## NATURE OF THE ACTION

1. HPE brings this action to stop Mr. Wheeler—a Vice President-level HPE executive entrusted with HPE's Morpheus Software business—from his ongoing improper possession, use, and disclosure of HPE's highly sensitive trade secrets and other confidential information, in breach of his contractual and other confidentiality obligations to HPE and in violation of federal trade secret law. While employed by HPE and operating under those contractual obligations that assigned all ownership of developed software to

HPE, Mr. Wheeler oversaw development of an artificial intelligence ("AI") software tool called "Hero" using HPE resources, personnel, and confidential data without adhering to HPE protocols. Engineers on Mr. Wheeler's team at HPE were directed to integrate Hero into HPE's internal engineering workflows for its proprietary Morpheus Software, and to leverage it to speed development of Morpheus, and they did precisely that. Then, hiding behind an alias—"chet-bellows"—Mr. Wheeler published Hero to the world—and took steps to ensure he could keep using it, and control it, as part of his plan to leave HPE and start a competing business with HPE's intellectual property. But under the clear terms of Mr. Wheeler's contracts with HPE, Hero and all of its intellectual property are HPE's property.

2. Mr. Wheeler knows the value of Hero and the binding HPE requirements to have kept it confidential: Mr. Wheeler, in concert with other software engineers on his HPE team, developed Hero using HPE's resources and for the purposes of streamlining and expediting their work on HPE's Morpheus Software—the software that Mr. Wheeler built at his former company, Morpheus Data Holdings, LLC ("Morpheus Data"), that Mr. Wheeler sold to HPE in 2024. In connection with HPE buying Morpheus Data, HPE hired Mr. Wheeler, along with engineers and other Morpheus Data employees (together "Mr. Wheeler's team"). HPE also acquired the products, intellectual property, services, and other assets owned by Morpheus Data and Mr. Wheeler. Unfortunately, while the transition of Morpheus Software into HPE's product offerings was successful, transition of Mr. Wheeler as a faithful HPE Vice President was not.

3. By October 2025, Mr. Wheeler was complaining to colleagues about losing control over "[his] product," and he wrote that it "would be smart for [HPE] to just pay me to leave in exchange for not stealing people or going to a competitor with all the knowledge of how to beat them." Ex. 1 [FW Information from Slack.msg]. Despite Mr. Wheeler agreeing to be a part of the HPE team for several years as part of HPE buying Morpheus Data, Mr. Wheeler started trying to negotiate his early exit from HPE in July of 2026. Meanwhile, Mr. Wheeler and certain members of Mr. Wheeler's team developed Hero, a tool that would allow him to leverage HPE's trade secrets and other confidential and proprietary information after leaving HPE.

4. Specifically, in the spring of 2026, Mr. Wheeler and certain members from his team began building Hero using HPE resources, including confidential and proprietary information, in a non-HPE, private location on the source code repository platform, GitHub. GitHub is a cloud-based web platform that allows users to store, manage, review, and edit source code to collaborate on software projects. Mr. Wheeler, attempting to conceal his activities, later moved his development into a new account under the alias "chet-bellows" and continued work by acquiring, using, and disclosing HPE confidential information outside of HPE's systems, while disguising his work as that of "chet-bellows."

5. Although Mr. Wheeler concealed the work developing Hero, by May 2026, developers on Mr. Wheeler's HPE team were being directed (by Mr. Wheeler or those acting in concert with him) to use Hero as part of their software development workflow in their work at HPE. HPE later learned that in response, engineers observed that the instructions to use a tool that was maintained in a ***private*** GitHub repository raised several

red flags, including uncertainty regarding where the tool originated and whether HPE software policies were being followed. "Open source" software (computer software with source code and often other detailed information available for anyone to view, modify, copy, and potentially distribute) can, in some instances, be safely and properly used in HPE's business, after careful vetting for security and other issues. The "open" nature of open source software allows for such vetting. In contrast, closed-source or private software cannot be fully vetted, and using it carries significant security and other risks. The then-***private*** status of Hero raised multiple security and confidentiality issues, including because Hero gives AI coding agents persistent, searchable memory of a software development team's work.

6. Even though Hero was created by Mr. Wheeler and other HPE engineers using HPE data and resources and owned by HPE including through its contracts with Mr. Wheeler, Mr. Wheeler stored Hero outside of HPE's systems and eventually made it publicly available using the chet-bellows alias attempting to conceal Hero's origin. By storing Hero outside of HPE's systems, Mr. Wheeler ensured his continued access to and control over it, even if Mr. Wheeler and his team left HPE—which they were already planning to do. Mr. Wheeler was well aware of HPE contracts, policies, rules, and procedures protecting HPE trade secrets and confidential information, as well as rules and policies surrounding publication of HPE code, software, data, and other materials, and he blatantly violated them.

7. By the time Mr. Wheeler, posing as "chet-bellows," posted Hero publicly on GitHub on or about August 24, 2026, he had already informed HPE Human Resources in

July 2026 that he wanted to negotiate an early exit. By late September 2026, as Mr. Wheeler was discussing an early separation, HPE's cybersecurity group was questioning him about large volumes of files that Mr. Wheeler transferred off his HPE-managed laptop in violation of governing confidentiality obligations and acceptable use policies. On September 29, 2026, Mr. Wheeler assured HPE that no HPE information existed outside his HPE-managed device.

8. On September 30, 2026, HPE received an anonymous tip through the HPE Ethics Hotline, which stated in part:

> From approximately May 2026, our team was directed to use the Hero tool as part of our software development workflow. At that time, the project was not publicly available and appeared to be maintained in a private repository. Subsequently, the Hero project became publicly available as an open-source project. This occurred after Brian Wheeler announced that he would be leaving HPE.

9. Mr. Wheeler was not working alone. In April 2026, he searched GitHub to locate his colleague, David Estes—a former Morpheus Data executive and technical/software expert who joined HPE with Mr. Wheeler in the acquisition—as a potential collaborator on Mr. Wheeler's private "bdwheeler/hero" GitHub repository. Mr. Estes then contributed to Hero's development. That same month, other former Morpheus employees who joined HPE in the acquisition began repeatedly running unauthorized scripts and commands in HPE computer systems to disable internal HPE security software that blocks access to file-sharing and webmail sites. Within days of the hotline tip, and just after the October 1, 2026 close of the retention period that made him eligible for a large monetary retention bonus incentive, Mr. Estes announced his resignation from

HPE. As both Mr. Wheeler and Mr. Estes prepared to exit HPE, Mr. Wheeler stored Hero where they would be able to continue accessing it upon leaving HPE.

10. Hero itself, its underlying code, and several categories of associated materials are HPE trade secrets, developed with HPE resources and tools for use with its immensely valuable Morpheus Software, and designed specifically to expedite development and utilization of HPE's Morpheus Software. Hero additionally includes other HPE trade secrets and confidential information, including source files and referenced data, HPE internal Jira data, internals of the HPE proprietary Hero Code and Hero Cloud, and other non-public HPE data, together the "Hero Trade Secrets."

11. HPE owns the Hero Trade Secrets, which were created using its resources, including other confidential and proprietary information and data, and for use with its core product—Morpheus Software. Like other HPE employees, Mr. Wheeler is bound by contracts, which govern the use of HPE Confidential Information and Trade Secrets, and HPE's ownership of those trade secrets.

12. While Mr. Wheeler was taking steps to make Hero available to himself outside of HPE systems and after leaving HPE, Mr. Wheeler attempted to further prepare to compete against HPE upon his departure with HPE's own proprietary and confidential information. Despite telling an HPE colleague on September 25, 2026 that he had plans for his "next career in low voltage wiring and AV equipment" for "wiring houses for wifi and security and home theaters," and noting that for a while he had been considering opening a pizza shop and was excited to not be doing software, Mr. Wheeler's actions at the end of his HPE tenure confirm his true intent to compete with HPE using several

misappropriated trade secrets. On or about October 11, 2026, he requested access to HPE's sales quotation system, which contains HPE customer names and information, and was not needed for any of Mr. Wheeler's HPE job responsibilities. HPE denied that request.

13. HPE attempted to resolve this matter without litigation and specifically to end Mr. Wheeler's continued possession of HPE trade secrets, confidential information and proprietary materials, but Mr. Wheeler refused to cooperate and confirmed that he has without permission removed HPE source code and other HPE data to personal devices, including a personal laptop, and non-HPE repositories; confirmed he made false representations regarding his possession of HPE source code and confidential information; and confirmed that his theft includes at least the Hero tool and the source code for the Morpheus software. HPE cannot stand idly by while Mr. Wheeler has continued improper possession of HPE trade secrets and confidential information, some of which he has put in publicly accessible locations. Because Mr. Wheeler refused to cooperate, this action for injunctive relief is necessary to protect HPE from continued improper possession, use, and disclosure of HPE's trade secrets, and to ascertain the full scope of Mr. Wheeler's unlawful possession and disclosure of them.

## THE PARTIES

14. Plaintiff HPE is a Delaware Corporation with its principal place of business located at 1701 E Mossy Oaks Road, Spring, Texas 77389 and with major technology hubs in Colorado and California. It is a global technology leader, which traces its roots back to the Hewlett-Packard Company's founding in 1939 in Palo Alto, California. HPE

was formed in 2015 when the Hewlett-Packard Company separated its consumer and enterprise businesses. HPE focuses on providing enterprise technology solutions to its customers across numerous industries. Within the United States, HPE has several areas of focus including networking solutions, compute solutions, supercomputing solutions, enterprise data storage solutions, private cloud solutions, software, and industries support. On August 14, 2024, HPE acquired Morpheus Data, a software platform used for managing multicloud and hybrid information technology systems. Today, HPE offers HPE Morpheus Software, which unifies hybrid cloud operations and allows organizations to better visualize their cloud operations and streamline provisioning and automation across virtual machines, containers, clouds, and AI-era infrastructure.

15. Defendant Brian Wheeler is an adult individual residing at either 5 Viking Dr, Cherry Hills Village, Colorado 80113 or at 1501 E Layton Avenue, Englewood, Colorado 80113. Mr. Wheeler was the co-founder and CEO of Morpheus Data until its acquisition by HPE in 2024. Mr. Wheeler continued to work on the Morpheus Software product at HPE as a Vice President until October 13, 2026, when he was placed on administrative leave.

## **JURISDICTION**

### **A. Subject Matter Jurisdiction**

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises out of violations of federal law under the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq.

17. Plaintiff's remaining claim falls within the Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, because the state law claim is so related to the Federal question that they form part of the same case or controversy and derive from a common nucleus of operative facts.

18. This Court also has diversity jurisdiction over the subject matter of this action because there is diversity of citizenship between the parties pursuant to 28 U.S.C. § 1332(a) and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff HPE is a Delaware corporation. Defendant Mr. Wheeler resides in Colorado.

### B. Personal Jurisdiction

19. This Court has personal jurisdiction over Mr. Wheeler. Mr. Wheeler has resided at all relevant times in the district, either at 5 Viking Dr, Cherry Hills Village, CO 80113, which is in the District of Colorado and/or at 1501 E. Layton Avenue, Englewood, Colorado 80113, which is also in the District of Colorado. Mr. Wheeler is domiciled in the forum state such that this Court has general personal jurisdiction over him.

## VENUE

20. Venue is proper in this District, pursuant to 28 U.S.C. § 1391(b)(1) and/or (b)(2). Mr. Wheeler resides at either 5 Viking Dr, Cherry Hills Village, CO 80113 or 1501 E. Layton Avenue, Englewood, Colorado 80113. In addition, venue is also proper in this District, pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in Colorado. Specifically, Mr. Wheeler misappropriated HPE trade secrets by his improper acquisition, use, and disclosure of the trade secrets in

Colorado, while employed by HPE in Colorado, and his continued possession of HPE trade secrets and refusal to submit his devices are part of the ongoing misappropriation occurring in this district. Further, Mr. Wheeler signed his employment agreement with HPE at 5460 S. Quebec Street, Suite 330, Greenwood Village, Colorado, 80111 while he was in Colorado and through his placement on administrative leave, was based in Colorado for his employment.

## ADDITIONAL FACTUAL ALLEGATIONS

### A. With the Acquisition of Morpheus Data, HPE Expanded Its Capabilities And Developed a New Product Line

21. HPE develops, licenses, markets, sells, and supports enterprise software, services, and related technology across many industries, including software development products and services associated with agentic artificial intelligence agents. Artificial intelligence agents are semi-autonomous software programs powered by large language models that can use external tools and execute multi-step plans to complete tasks or achieve a goal.

22. In August 2024, HPE purchased Morpheus Data, a software platform used for managing multicloud and hybrid information technology systems for approximately $150 million. Morpheus Data provided a software platform that unifies management of multicloud and hybrid IT while empowering DevOps (a software engineering methodology that merges software development (Dev) and IT operations (Ops) into a continuous, automated lifecycle) teams with self-service provisioning. HPE saw significant value in the technology offered by Morpheus, which was already used by and complemented HPE's own products, services, research, and technology development.

23. As part of HPE's purchase of Morpheus, and to ensure a smooth transition and integration of the technology HPE bought from Morpheus, HPE hired key members of Morpheus' leadership as HPE employees in addition to Morpheus' founder, Brian Wheeler. Prior to acquisition, Mr. Wheeler was the Chief Executive Officer and co-founder of Morpheus Data Holdings, LLC.

24. With HPE's acquisition of Morpheus Data, HPE expanded its ability to deliver a complete hybrid cloud operating model to its customers, including with HPE's Morpheus Software platform. In 2024, HPE offered its GreenLake product to customers, a cloud service product that helps simplify IT complexity. HPE's integrating Morpheus into GreenLake simplified and optimized HPE's cloud management offerings by creating a consistent, end-to-end management experience for workloads across traditional and modern cloud environments. Morpheus Software manages multi-vendor, multicloud capabilities and helps HPE's customers optimize workloads and achieve cost savings through effective cloud cost management. By integrating Morpheus with GreenLake, HPE became the first company to offer a full suite of enterprise-grade capabilities across the hybrid cloud stack.

25. Following HPE buying Morpheus Data, the continued development and sale of Morpheus Software was done within an HPE business unit, in which Mr. Wheeler worked alongside his team. Among the Morpheus Data executives who joined HPE was David Estes, who joined HPE as Vice President of Engineering working on Morpheus. This business unit continues to develop and maintain the Morpheus Software, including through a project internally referred to as [redacted].

26. Although the acquisition of Morpheus Data led to full incorporation of the Morpheus Software into HPE's suite of products, the integration of Mr. Wheeler, Mr. Estes and certain members of Mr. Wheeler's team was challenging. Mr. Estes resigned from HPE in October, 2026, and Mr. Wheeler's tenure was tense from the outset, with Mr. Wheeler repeatedly expressing dissatisfaction with his role at HPE.

27. Mr. Wheeler made his discontent plain. In internal messages in late October 2025, Mr. Wheeler declared that he had "0 motivation to help" now that "[his] product" had been taken away, noting that he was paid "the same [whether] it succeeds or not." He suggested that it "would be smart for hpe to just pay me to leave ***in exchange for not stealing people or going to a competitor with all the knowledge of how to beat them***." Ex. 1 (emphasis added).

28. Mr. Wheeler's dissatisfaction escalated over the next year. In early to mid-July 2026, Mr. Wheeler told HPE Human Resources that he wanted to exit HPE before his August 2027 contract term expired. By September 2026, the parties mutually agreed to explore and attempt to negotiate Mr. Wheeler's early separation from HPE.

### B. HPE's Trade Secrets and Other Related Confidential and Proprietary Data Relating to Hero

29. HPE is a leading enterprise technology company that combines AI, cloud, and networking to help organizations achieve more. In the United States, HPE provides a broad range of enterprise hardware, software, services, and related technologies. Its solutions cover networking, hybrid cloud infrastructure, AI, computing, data storage, and supercomputing. HPE's software portfolio automates service delivery, observes workloads in real time, and protects data and services across cloud, infrastructure, and

application environments. HPE serves customers across many industries, including in the U.S. federal government, healthcare and life sciences, manufacturing, and financial services. HPE delivers these technologies through GreenLake, a cloud-native platform that offers pay-per-use IT services and infrastructure from edge to cloud, and through HPE services, which provides consulting, implementation, and operational support for IT transformation. Hybrid cloud is one of HPE's core offerings. Enterprise customers increasingly run workloads across many vendors, clouds, and infrastructure types. HPE's success therefore depends on its ability to keep developing software that simplifies this complexity, controls costs, and keeps pace with AI-era infrastructure. HPE has gained this market position by investing significant time, money, and resources in the research, engineering talent, tools, and development processes that produce its software.

30. One of the key software products within HPE's hybrid cloud business is the HPE Morpheus Software, which HPE developed from the Morpheus Data platform it acquired and integrated into GreenLake. The HPE Morpheus Software gives enterprise customers a single, governed control plane to provision, automate, and manage workloads across virtual machines, public and private clouds, and AI-era infrastructure.

31. Morpheus addresses the complex, distributed environments in which organizations do business, including on-premises infrastructure, private cloud, and multiple public cloud platforms. Morpheus manages these diverse infrastructures by reducing administrative overhead, and increasing visibility across the full infrastructure landscape. Without Morpheus, operations relied on time-consuming, manual inputs that slowed operations, increased cost, and increased risk of human error as systems become

more complex, HPE's Morpheus Software addresses these challenges directly by providing a centralized platform for managing and orchestrating IT infrastructure across environments. Morpheus Software enables customers to improve their operational efficiency, cost automation, risk reduction, and governance.

32. Morpheus' architecture lets customers run different virtual machine monitors—software that manages virtual copies of physical computers—and clouds side by side. It also provides tools to shift workloads away from other platforms, giving customers a lower-cost alternative. HPE offers its Morpheus Software in several versions, as part of HPE's private cloud offerings. The HPE Morpheus Software's success depends on HPE's ability to continually develop, test, secure, and improve it, including by adding new automation, cost-management, and AI-driven operations capabilities.

33. Upon acquiring Morpheus Software, HPE's Morpheus business unit carried out this ongoing development using HPE's proprietary internal tools, source code, and development data that HPE maintains as confidential, including through projects on which the business unit is working. One such project is called "[redacted]." This project includes the continued development of the Morpheus Software to support and improve the features and benefits described above. Providing this software requires continual improvements to take advantage of new developments in the computing industry and ongoing maintenance to resolve customer problems.

34. HPE uses various tools, data, and source code to continue to develop and improve the Morpheus Software, and it does so within the requirements of HPE in order to ensure the security of its software and systems and to protect its intellectual property.

The Hero tool developed by HPE employee(s) is a software "harness" tool that surrounds a large language model ("LLM") and enables it to act on tasks. Hero creates a streamlined and repeatable engineering workflow by enabling AI agents to "recall" and search prior interactions with all members of the software team from a persistent memory. By doing so, Hero makes developing new software easier and faster, using the requests and tasks that the team has already submitted as context to facilitate further development and to produce design specifications. While Hero has conferred substantial benefits, its development and disclosure outside of HPE's rules and systems also has created vulnerabilities.

35. HPE software development engineers and employees, having been instructed to deploy the tool by Mr. Wheeler and those working with him, rely on Hero in their work, and report increased productivity from streamlining and expediting their software development. Several sources of HPE confidential and proprietary data were and are used in Hero's development and operation, including source code, source files and related data, HPE's internal Jira data, and internals of the HPE proprietary Hero Code and Hero Cloud.

36. ***The Hero Tool:*** As of approximately October 9, 2026, Hero tool itself, including its associated execution and data files, along with its skills and agent instructions (including, for example, .md files and .txt files), is proprietary HPE software and HPE confidential information. Hero was developed and refined using HPE resources and personnel. Beginning in approximately May 2026, engineers on Mr. Wheeler's team at HPE were instructed to use the Hero tool, and HPE's systems contain Hero working

files (".hero files"), confirming that the Hero tool is functional and has been used in HPE engineering work streams.

37. The Hero tool's functionality is implemented in proprietary source code files contained in the Hero GitHub repository. The repository's top-level hero directory contains 48 subdirectories and approximately 28 files that provide the configuration, testing, and coding resources necessary for Hero to execute. Most of Hero's approximately 1,160 source code files are written in the Go programming language (.go files), and nearly all of them are located in the repository's [redacted] directory. Example .go files contained in the Hero repository include [redacted], and over 1,000 additional files, a sample of which are presented in the table immediately below:

| Example Hero Source Code Files |
| --- |
| [redacted] |

| Example Hero Source Code Files |
| --- |
| [redacted] |

38. This information creates great economic value for HPE from not being generally known by HPE's competitors and not being readily ascertainable through proper means. While the Hero tool has substantial value to HPE by streamlining development, its presence outside HPE's security systems poses risks, including by creating access for exploitation and exfiltration. Documentation associated with Hero indicates that its initial use saved more than [redacted] of development time during the early adoption period between [redacted], and HPE employee communications state that Hero has proven to be an effective software development tool and that HPE software developers substantially increased their productivity "[redacted]" after incorporating it, providing HPE developers with a competitive advantage in a challenging business sector. The Hero tool was created by leveraging proprietary and confidential HPE information, reflects substantial time, resource, and monetary investment by HPE, and—like HPE's other internally developed software, source code, and tools—is the type of information that HPE protects from disclosure outside of the company.

39. ***Proprietary Hero Cloud Source Files and Referenced Data:*** Hero Cloud is the server-side component of the Hero tool, which enables persistent project memory that can be synchronized across members of a development team. Hero Cloud source

files, associated data, and session database details that are or were hosted on the Hero GitHub associated with Mr. Wheeler are proprietary and confidential HPE information.

40. The Hero GitHub repository discloses architectural details, including that the Hero Cloud source files and associated data include at least 45 Hero Cloud source files spanning HPE's [redacted] directories, a Dockerfile defining Hero Cloud's deployment configuration, and three session databases at the [redacted] path. The GitHub repository associated with Mr. Wheeler also reveals the structure of Hero Cloud's implementation in multiple files (e.g., [redacted]) and would enable other businesses to accelerate their development of competing products and services. Specifically, certain files in the GitHub repository can give readers an understanding of how data processed by Hero is received, stored, and synchronized between cloud and client Hero instances (e.g., [redacted]).

41. This information creates great economic value for HPE from not being generally known by HPE's competitors and not being readily ascertainable through proper means. The Hero Cloud source files enable remote servers to interact with local client computers, while the session databases store persistent, searchable development interactions that artificial intelligence agents use to streamline future programming efforts. Files in the Hero repositories reveal the structure of Hero Cloud's implementation, including how data processed by Hero is received, stored, and synchronized between

cloud and client Hero instances, and would enable others to accelerate their development of competing products and services.

42. ***HPE Internal Jira Data:*** Jira is project management software that HPE uses to track internal software development work, testing efforts, bug resolution, and security issues associated with its products and services. The GitHub Hero repositories associated with Mr. Wheeler contain pointers to HPE's internal Jira data and metadata. [redacted] is a key development project of HPE's Morpheus business unit, and the Hero GitHub repositories include pointers to HPE [redacted] Jira data. Notably, HPE uses Jira for software testing, and the [redacted] data included in the Hero GitHub repositories contains pointers, which function like addresses, and depict locations with detailed information for Jira tickets with HPE origins (e.g., [redacted]). The Jira data in the GitHub repositories also includes directories for active projects (e.g., [redacted]), 508 active issues which include 8 security issues, and more than 1,000 active software bugs. The [redacted] data also includes information on HPE's actual testing fixtures (e.g., HPE's [redacted] and [redacted]), which detail the steps taken to verify whether HPE code meets the requirements set forth by internal development teams. Test fixture file locations (e.g., [redacted] and [redacted]/) are also included with HPE's [redacted] Jira data. Further, Jira data from HPE's software development and testing operations is also disclosed without authorization within the Hero GitHub repository in a directory requiring no additional HPE authentication or permission to access (e.g., [redacted]). The index file describing HPE's confidential

Jira information can be viewed alongside fifteen other subfolders and associated files at the same location. The [redacted] Jira data in the repository discloses the types of [redacted] issues that HPE is addressing and provides a non-public view of how engineering work is allocated for [redacted] (the 508 active issues comprise 226 Stories, 132 Bugs, 107 Subtasks, 18 Chores, and 17 Epics), along with the existence of current security issues.

43. This information creates great economic value for HPE from not being generally known by HPE's competitors and not being readily ascertainable through proper means. This data and metadata reveal confidential aspects of HPE software development, including projects under development, development status, and the existence of current security issues. The data also provides IT attack vectors, giving bad actors entry points to HPE systems. This information was created leveraging other proprietary and confidential HPE information, reflecting substantial time, resources, and monetary investment by HPE.

44. ***Internals of HPE Proprietary Hero Code and Hero Cloud:*** The GitHub Hero repositories associated with Mr. Wheeler also contain several types of other HPE-internal information and trade secrets concerning Hero Code and Hero Cloud. Specifically, this includes Hero Cloud design files reflecting the Hero Cloud architectural and backend design, including the configuration of its server stack technologies (e.g., [redacted]) that have been integrated with HPE's software, within HPE's ecosystem, to serve HPE products and services. While certain of these systems, features, and technologies are publicly

available, HPE's specific implementation details revealed by the uploaded versions of the Hero GitHub repositories are not. Further, the GitHub repositories include specific, actual HPE file paths into HPE's computer systems associated with the Hero Code, again pointing to further confidential, proprietary files, data, and code. These file paths reveal non-public aspects of HPE's product development and again provide attack vectors for bad actors attempting to gain unauthorized access to HPE's computing systems. The files include at least 18 separate file paths from a proprietary HPE Swift application, and some paths (e.g., [redacted]) even contain quoted source code.

45. In the Hero GitHub repository, approximately 200 .hero files reference Hero Code, and between 70 and 85 .hero files reference Hero Cloud. Representative examples are listed in Tables B and C, respectively, below. Each file path reflects the location of the file within the GitHub repositories, and certain files appear in both tables because they reference both Hero Code and Hero Cloud.

| **Example Hero Code Files** |
| --- |
| [redacted] |

| Example Hero Code Files |
| --- |
| [redacted] |

| Example Hero Code Files |
| --- |
| [redacted] |

| Example Hero Cloud Files |
| --- |
| [redacted] |

| Example Hero Cloud Files |
| --- |
| [redacted] |

46. This information creates great economic value for HPE from not being generally known by HPE's competitors and not being readily ascertainable through proper means. The architectural choices and implementation details of Hero Code and Hero Cloud reflect HPE's design decisions regarding scalability, messaging, data isolation, and security, are not generally known, and would allow a competitor to replicate or build upon HPE's designs without the corresponding research and development. This information was created leveraging other proprietary and confidential HPE information, reflecting substantial time, resources, and monetary investment by HPE.

## C. HPE Took Substantial Measures to Protect Its Trade Secrets

47. HPE takes significant measures to protect its confidential information and trade secrets described above and in this Complaint. These multiple layers of protection work in concert to minimize the risk of leaks, identify abnormal data use, and prevent improper acquisition, use, and disclosure of this information.

48. **Software Protections**: HPE employs software platforms that enable HPE to maintain visibility and control over HPE's internal and third-party systems that can access HPE confidential data and trade secrets. For example, HPE records system access with a suite of commercially available products and customized by HPE for its systems, including a security platform installed on HPE-managed computers that routes the computer's internet traffic through HPE-controlled web proxy controls. These products route internet traffic through HPE web proxy controls that block access to websites and actions that pose security risks, and record logs of the websites a user visits. In addition, HPE also maintains records of the devices associated with each user, as well as Microsoft 365 activity logs. Accordingly, HPE can trace user activity and web traffic, allowing HPE to detect and address insider threats.

49. **Confidentiality Obligations and Training**: HPE further protects its trade secrets through employee agreements, policies, and trainings. Mr. Wheeler signed an employment agreement including an HPE Agreement Regarding Confidential Information and Proprietary Developments (ARCIPD). Ex. 2. The employment agreement specified that "[t]his offer and your employment are conditional upon your review and acceptance

of the ARCIPD." Ex. 3 at 3. Mr. Wheeler signed his HPE employment agreement on August 13, 2024.

50. Mr. Wheeler also signed his HPE ARCIPD agreement on August 13, 2024. Ex. 2. Section "2. Confidential Information" of the ARCIPD governs use of HPE Confidential Information and Trade Secrets, explaining the "Agreement concerns confidential business and technical information and know-how not generally known to the public which is acquired or produced by me in connection with my employment with HPE (hereinafter "Confidential Information") as well as trade secrets that are acquired or produced by me in connection with my employment by HPE. Ex. 2. The paragraph states that: "Confidential Information is presumed to include, without limitation, information regarding HPE customers (such as customer lists, contact information, and preferences), suppliers, organizations, staffing, finance, structure, research and development, manufacturing and marketing, files, keys, certificates, passwords and other computer information, as well as information that HPE receives from others under an obligation of confidentiality." Section 2 of Mr. Wheeler's signed agreement further provides:

> I agree to abide by HPE's Confidential Information Policy and specifically agree that with regard to HPE Confidential Information and trade secrets:
>
> a. to use such information only in the performance of HPE duties;
>
> b. to hold such information in confidence and trust; and
>
> c. to use all reasonable precautions to assure that such information is not disclosed to unauthorized persons, including, without limitation, through the media, blogs, social networking sites or other online forums, or otherwise used in an unauthorized manner, both during and after my employment with HPE.

*Id*. Section "3. Proprietary Developments" of the ARCIPD governs ownership of inventions and discoveries:

> This agreement also concerns inventions and discoveries (whether or not patentable), designs, works of authorship, mask works, improvements, data processes, computer programs and software (hereinafter called 'Proprietary Developments') that are conceived or made by me alone or with others while I am employed by HPE and that relate to the research and development or the business of HPE, or that result from work performed by me for HPE, or that are developed, in whole or in part, using HPE's equipment, supplies, facilities or trade secret information. Such Proprietary Developments are the sole property of HPE and I hereby assign and transfer all rights in such Proprietary Developments to HPE. I also agree that any works of authorship created by me shall be deemed to be "works made for hire." For all Proprietary Developments, I further agree:
>
> a. to disclose them promptly to HPE;
>
> b. to sign any assignment document to formally perfect and confirm my assignment of title to HPE;
>
> c. to assign any right of recovery for past damages to HPE; and
>
> d. to execute any other documents deemed necessary by HPE to obtain, record and perfect patent, copyright, mask works and/or trade secret protection in all countries, in HPE's name and at HPE's expense.

*Id*. Section "5. Work Product" of the ARCIPD governs Work Product:

> The product of all work performed by me during and within the scope of my HPE employment including, without limitation, any files, presentations, reports, documents, drawings, computer programs, devices and models, will be the sole property of HPE. I understand that HPE has the sole right to use, sell, license, publish or otherwise disseminate or transfer rights in such work product.

*Id*. Section "6. HPE Property" of the ARCIPD governs HPE Property:

> I will not remove any HPE property from HPE premises (including but not limited to HPE systems and networks) without HPE's permission. Upon termination of my employment with HPE, I will return all HPE property to HPE unless HPE's written permission to keep it is obtained (including, but not limited to, HPE records and business correspondence such as email, spreadsheets, data compilations, and other business records stored in digital or electronic files).

*Id*.

51. Accordingly, Mr. Wheeler was required to maintain the Hero Trade Secrets and related confidential information only in the performance of his HPE duties, to hold such information in confidence and trust, to not remove the Hero Trade Secrets from the HPE systems and networks, and to use reasonable precautions to assure that such information was not disclosed. Because at least some of the Hero Trade Secrets were developed by Mr. Wheeler and others during employment by HPE and relate to the business of HPE, Mr. Wheeler, through at least the ARCIPD agreement, assigned all ownership of the Hero Trade Secrets to HPE and did not have any independent ownership of the technology.

52. HPE also has a Confidential Information Policy, which Mr. Wheeler is bound by under his ARCIPD. ARCIPD, Section 2 ("I agree to abide by HPE's Confidential Information Policy . . . ."). The Confidential Information Policy requires that all company information "must be used only for business purposes," and employees "may use company information only for business purposes and disclose it – internally or externally – only for a good business reason and with adequate safeguards." Ex. 4 (HPE CIP) at 2. The Confidential Information Policy explains that "[i]nappropriate disclosure of the company's sensitive information or improper receipt of nonpublic information from others can weaken our competitive position, jeopardize our Research and Development (R&D), and squander our investments in the processes and resources we have developed for conducting our business." *Id*. at 1. The policy dictates that "[a]ll company information, whether sensitive or not, is company property and must be used only for business

purposes. *Id*. "You may use company information only for business purposes and disclose it – internally or externally – only for a good business reason and with adequate safeguards." *Id*. at 2.

53. Mr. Wheeler further agreed to be subject to HPE's Standards of Business Conduct ("SBC") when he signed his offer of employment. Ex. 3 (Wheeler Offer Letter). The agreement provides: "I have read, understand and agree to comply with the Company's Standards of Business Conduct ('SBC') and all related policies … and acknowledge my responsibility to comply with the SBC and related policies following the commencement of my employment." *See id*., at p. 5. The SBC requires that HPE employees "safeguard the integrity of [HPE's] sensitive and confidential information, and [HPE's] intellectual property, by taking appropriate steps to avoid unauthorized disclosure. . . . . You may use and disclose sensitive HPE . . . information only for legitimate business purposes, and only when appropriate protections are in place . . . ." Ex. 5, (SBC) at 17. The SBC states that confidential information includes HPE "Intellectual property, including … trade secrets, and technical designs." *Id*.

54. Additionally, HPE's Open Source Software Program specifically prohibits employees from publishing HPE source code or other HPE information to public forums, including open-source repositories, without first obtaining approval. Ex. 6 (Open Source Software Program policy). The policy explains that "unauthorized release of HPE software under an open source license may adversely affect HPE's business strategy and intellectual property rights. Therefore, as part of HPE's overall approach to open technologies, HPE has established a review process for HPE's use, distribution and

release of code under any open license, open source or otherwise." *Id*. at 1. The policy further establishes that "[a]ll HPE personnel involved in the procurement, development, use, or release of open source software must follow this policy." *Id*. HPE product and project teams "are responsible for following HPE's open source review process" including for "the release of HPE-owned software under an open source license." *Id*. at 2. The policy explains that generally an open source license is given when a recipient can "freely copy, modify and distribute the licensed software, in source code or binary form." *Id*. Mr. Wheeler's publication of the Hero Trade Secrets, including underlying source code, on a public GitHub repository without first obtaining HPE approval violated HPE's Open Source Software Program. HPE maintains an Open Source Review Board ("OSRB") that reviews requests to use or release open source software. The Morpheus business unit at HPE that Mr. Wheeler led was aware of these policies: between November 2024 and October 2026, members of Mr. Wheeler's team submitted at least nine requests to the Open Program Office relating to approvals for use of open source software. No request for approval was submitted to OSRB to open-source the Hero tool and associated files.

55. Mr. Wheeler was also required to complete, and did complete, training concerning the protection of HPE information. This includes trainings which Mr. Wheeler completed on October 13, 2025 and on October 5, 2026. Ex. 7 (Wheeler Training Excel Document). One such training includes a chapter on "Protecting Resources" that explains the importance of information security and confidentiality obligations and protections. Ex. 8 (SBC FY25 Module 4 - Headline Test, Conflicts training) at 28-36. In this chapter, employees are instructed to "[d]o HPE work on HPE laptops and IT systems, including

HPE approved messaging apps." Employees that use their own devices under the Bring Your Own Device Program are required to follow the Program's Terms of Use. *Id*. at 30. Employees are further instructed to "never disable, modify, or bypass any security software or settings." *Id*. at 31. Employees are also instructed that they "cannot use your HPE laptop or other assets to "conduct any fraudulent or illegal activity . . . ." *Id*. at 32. The training explains that "[a]s HPE team members, we are expected to safeguard the integrity of our sensitive and confidential information, and our intellectual property" and that "confidential or sensitive business information can include" several pieces of information including "research and development," and "trade secrets." *Id*. at 33. The training specifically instructs HPE employees on Use and Disclosure:

> You may use and disclose sensitive HPE, customer, business-partner, or supplier information only for legitimate business purposes, and only when appropriate protections are in place. Confidential information should only be disclosed when the other party has a business need-to-know it, and again only with the appropriate protections in place. Remember that disclosure can occur not only via formal or written communications, but also through casual conversations, email, social media, conversations held in public settings, or via use of a public generative AI platform.

*Id*. at 35. This chapter of the training concludes with explaining why confidential information is important:

> HPE confidential information is vital to our success. Inappropriate disclosure of HPE's confidential information or improper receipt of nonpublic information from others can hurt the company. It can weaken our competitive position and jeopardize our business. Every HPE team member has a duty to protect our confidential information.

*Id*. at 36.

56. Mr. Wheeler's actions detailed in this complaint violate HPE's policies and his agreements with HPE, and the instruction he received in trainings.

**D. Mr. Wheeler Circumvented HPE Data Protection to Improperly Acquire, Use, and Disclose HPE Trade Secrets and Confidential Information For His Own Benefit**

57. Approximately one year after he joined HPE, Mr. Wheeler expressed discontent with HPE's further development of Morpheus Software. In Slack messages to colleagues in October 2025, he expressed concern about losing control over "my product," repeatedly voiced disagreement with the project's direction, and indicated that he could leave HPE, taking employees and his knowledge of how to compete against HPE with him. On October 31, 2025, Mr. Wheeler discussed his entrepreneurship intentions and desire to separate from HPE with human resources. Mr. Wheeler did not depart from HPE at that time.

58. Instead, starting in April 2026, software developers and others on Mr. Wheeler's team repeatedly ran unauthorized scripts and commands to disable the security software installed on their HPE-managed devices, even though none had permission to do so. While disabled, the security system no longer blocked access to restricted categories of websites, such as file-sharing and webmail sites, and no longer recorded a log of the websites the computer visited, preventing complete logging of internet traffic, including any upload or transfer of HPE trade secrets or other data. During this time, in violation of the policies discussed above, Mr. Wheeler used a personal Mac computer rather than his HPE-managed device for certain HPE work, which he later admitted.

59. On September 17, 2026, HPE notified Mr. Wheeler that it had detected large volumes of files transferred from his HPE-managed laptop to an external network. Mr.

Wheeler responded that the files were log files used to troubleshoot a support ticket and had been destroyed. However, at least one of the files, transferred on August 28, 2026, was an archive of his Outlook email. On September 23, 2026, HPE informed Mr. Wheeler that it had also discovered that, in March 2026, he had plugged an SD card labeled "bw-hpe-code" into his HPE-managed laptop. Mr. Wheeler responded that "[n]othing has been transferred externally" and that the SD card was "sitting on my desk and currently blank." To date, Mr. Wheeler has not made any of his personal devices or his SD card or accounts available for inspection for HPE to inspect and verify what information was exported, including whether other HPE materials beyond the Hero Trade Secrets were impermissibly removed.

60. By late September 2026, Mr. Wheeler had requested early separation—prior to the term of his contract—from HPE. HPE met with Mr. Wheeler to discuss his request and his computer history and received Mr. Wheeler's (1) explanation for exporting files, (2) verbal agreement that the files were deleted and do not exist outside of the HPE-administered machine, and (3) statement that emails were archived to an outboard drive—purportedly to increase email speed—but were moved back to Mr. Wheeler's device after receiving a message from HPE. Ex. 9. On September 29, 2026, Mr. Wheeler confirmed in writing to HPE that no HPE information existed outside of his HPE-managed device. Ex. 10. During this time, Mr. Wheeler attempted to cover his tracks, telling a colleague on September 25, 2026 that he had plans for his "next career in low voltage wiring and AV equipment" for "wiring houses for wifi and security and home theaters," noting that he had been considering opening a pizza shop and was "excited" to not be

doing software. Yet his contemporaneous actions confirm he was actively misappropriating trade secrets to compete with HPE.

61. On September 30, 2026, HPE received an anonymous tip through the HPE Ethics Hotline raising a "[c]oncern regarding the provenance, ownership, approval process and open-source release of a software development tool used by engineering teams," and identifying the public Hero GitHub repository, https://github.com/hero-engine/hero. The tipster reported that "Hero was introduced into engineering workflows before it was publicly available," that "[t]he project later became publicly available as an open-source repository," and that "[p]ublic repository content contains references to the name 'Brian Wheeler' within technical discussions and examples." Ex. 11.

62. The anonymous tip pointed HPE to Mr. Wheeler and his team's development of Hero, using HPE trade secrets and other confidential and proprietary HPE data, outside of HPE's security systems. Since receiving the anonymous tip, HPE has further uncovered Mr. Wheeler's illicit conduct dating back to March 2026 in violation of his contractual obligations.

63. Between March 12 and March 31, 2026, Mr. Wheeler was working on Hero outside of HPE's systems and not on his HPE-approved device. In this timeframe, he ran searches about building agent "skills," "subagents," and "commands" for AI coding tools. On April 2, 2026, his browser recorded a page titled "[redacted]," a reference to a ticket number in HPE's internal Morpheus ("[redacted]") Jira project. On April 8, 2026, Mr. Wheeler searched for a "Name for LLM Tool," and on April 13, 2026, he searched for "a sweet logo for a product called hero."

64. On March 31, 2026, Mr. Wheeler also opened from a synced device a file stored in a “morpheus-central” folder under the /Users/bwheeler/ file path, indicating that a copy of an HPE Morpheus repository was stored on a device that HPE does not manage against HPE policy.

65. By April 13, 2026, Mr. Wheeler had created a private repository named bdwheeler/hero under his personal GitHub account, “bdwheeler.” That day, he opened the repository’s access settings and searched for potential collaborators, including the GitHub account of Mr. Estes. Mr. Wheeler continued to work on Hero under his bdwheeler account. Throughout this time period, Mr. Wheeler kept copies of Hero on a personal Mac that HPE does not manage.

66. In April, Mr. Wheeler moved his work on Hero to a GitHub account under the alias “chet-bellows” attempting to hide his affiliation with the tool. The account lists no name, email address, location, or other identifying information. On May 12, 2026, “chet-bellows” continued work on Hero and continued that work into August 2026, during which time, other HPE engineers, including Mr. Estes, authored or edited HPE’s Hero code. As unambiguously stated in Section 5 of ARCIPD, “The product of all work performed by me during and within the scope of my HPE employment including, without limitation, any files, presentations, reports, documents, drawings, computer programs, devices and models, will be the sole property of HPE.” Ex. 2 (ARCIPD).

67. On or about August 24, 2026, Mr. Wheeler published Hero on a public GitHub repository, attempting to disguise the tool as open-source as opposed to proprietary HPE property. As published, Hero and its associated hero-engine repositories

contained or revealed the Hero Trade Secrets, including the Hero tool itself; Hero Cloud source files and session databases of persistent development interactions; pointers to HPE's non-public Jira data for [redacted]; and internals of HPE's proprietary Hero Code and Hero Cloud, including design information and file paths into HPE's systems, as described above. The public disclosure of HPE trade secrets and other information also compromised HPE's information security posture.

68. As of October 9, 2026, all five repositories in the hero-engine organization were publicly accessible.

### E. HPE Attempted to Remedy Mr. Wheeler's Misappropriation Without Litigation, But Mr. Wheeler Refused to Fully Cooperate

69. On the afternoon of October 13, 2026, HPE notified Mr. Wheeler in writing that he was being placed on administrative leave, and HPE's outside counsel sent a cease-and-desist letter demanding that he preserve evidence and restrict public access to the hero-engine repositories without deleting or altering their contents. HPE's letter also requested that Mr. Wheeler immediately provide any (1) personal devices and (2) personal cloud accounts/ other storage repositories containing HPE information for forensic inspection by a third-party computer forensic expert. HPE also requested that the GitHub account chet-bellows be made private, without deleting or altering its contents, pending HPE's forensic inspection, and requested Mr. Wheeler's additional cooperation and assurances.

70. HPE stated that if Mr. Wheeler did not comply with these demands, it would be forced to seek emergency judicial relief to protect its confidential and trade secret information. Specifically, the letter made clear that HPE is preparing to immediately file a

lawsuit in federal court, along with an emergency application for a Temporary Restraining Order.

71. HPE sent its October 13, 2026 letter by email at 4:57pm. Within hours, the chet-bellows GitHub account was made private. *Cf* Ex. 12 (C. Lawless Letter to L. Lee) with Ex. 13 (Time-stamped screenshot).

72. On October 15, 2026, Mr. Wheeler replied through counsel dismissing HPE's concerns as "scurrilous" and "shockingly baseless allegations." Ex. 14 (October 15, 2026 email from J. Sawtelle to C. Lawless). Mr. Wheeler did not agree to provide his personal devices, cloud accounts, or other storage repositories. Mr. Wheeler did not acknowledge that the chet-bellows GitHub account was his own, that it was made private, its reasons for being made private, or whether any files, code, or commits were deleted from the chet-bellows account.

73. The parties continued to correspond and meet and confer, and the night before this filing, Mr. Wheeler made statements to HPE showing that he developed the Hero tool, removed HPE source code and other HPE confidential information to non-HPE and personal devices and repositories, used it for his own purposes, made false representations to HPE about his possession of HPE code, and that relevant information was allegedly deleted from at least five devices, but would not agree to surrender all implicated devices for forensic inspection or take the other actions identified by HPE needed to remediate the theft.

74. To date, Mr. Wheeler has not provided the requested assurances. He has not returned or accounted for all HPE information in his possession, has not agreed to

submit his devices and cloud accounts or other storage repositories for forensic inspection, has not identified all others involved, and has not confirmed in writing that he has not disclosed and will not disclose HPE's confidential, proprietary, and trade secret information.

75. Mr. Wheeler's misappropriation is ongoing. Removing the hero-engine repositories from public view did not return HPE's trade secrets to HPE—it only hid them from HPE and the public (at least under the chet-bellows' repository)—and left them in Mr. Wheeler's possession and control. HPE does not have ongoing visibility into Mr. Wheeler's actions and files, including his continued possession and use of HPE confidential information and trade secrets, including the Hero trade secrets.

**<u>Plaintiff's Right to Injunctive Relief</u>**

76. Defendant improperly acquired, used, and disclosed Plaintiff's trade secrets and other confidential and proprietary information, including the Hero tool, Hero Cloud Source Files and Data, HPE Jira Data, and Hero Code and Hero Cloud, which Defendant misappropriated from Plaintiff.

77. Mr. Wheeler will continue to breach his Agreements and confidentiality obligations to HPE unless enjoined as requested herein.

78. Plaintiff has a substantial likelihood of success on the merits of its claims.

79. The threat of harm to Plaintiff in the absence of injunctive relief far outweighs the threat of any harm to Defendant if injunctive relief is granted.

80. Defendant's only burden is to comply with the law and to compete fairly and lawfully in the marketplace without reaping any illicit gain or benefit from his actions described in this Complaint.

81. The public interest favors preventing Defendant from reaping illicit gains through the theft and misappropriation of Plaintiff's confidential information.

## FIRST CAUSE OF ACTION

### Trade Secret Misappropriation Under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, 1837, 1839, *et seq.*

82. HPE realleges and reincorporates every allegation above in paragraphs 1-79 as fully set forth herein.

83. HPE owns certain valuable trade secrets in and relating to its enterprise solutions for the Morpheus product, including HPE's proprietary Hero tool, proprietary Hero Cloud source files and data, HPE Jira data, and internals of the HPE proprietary Hero Code and Hero Cloud detailed above (collectively the "Hero Trade Secrets"). Each together and separately constitute trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

84. These confidential and proprietary trade secrets have substantial economic value and have given HPE a competitive advantage, including because HPE paid approximately $150 million for Morpheus Data's intellectual property, products, and software, and has integrated the HPE Morpheus Software into its market-leading GreenLake IT services and infrastructure platform. HPE obtained this market position through the expenditure of significant time, money, and resources in obtaining and developing such confidential information and trade secrets. The Hero Trade Secrets, as

described above, constitute "trade secrets" within the meaning of 18 U.S.C. § 1839(3). This information is technical, engineering information, including plans, designs, techniques, processes, programs, software, and code.

85. Each of the Hero Trade Secrets that Defendant improperly acquired, accessed, and/or used derives independent economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means to other persons or entities who might obtain economic value from their disclosure or use. These trade secrets reflect and contribute to HPE's competitive advantage in the market of hybrid cloud platforms, which itself is the result of research, development, and substantial cost to HPE. Through the Hero tool, HPE's Morpheus team has increased productivity, helping them maintain the Morpheus Product's competitive position. The Hero tool increases the economic value of the Morpheus Product by assisting HPE in updating and continually improving the software. Disclosures of the Hero Trade Secrets would destroy this economic value by providing competitors with roadmaps to HPE's ongoing product development, software design and architecture, and security information, and provide technical advancement to competitors who could then bypass investing the necessary resources for independent development. If this information were generally known to HPE's competitors, it would harm HPE's business including, for instance, loss of customers and revenues, price erosion, and reputational harms.

86. HPE has deployed the above-described reasonable measures to protect the secrecy of its trade secrets and confidential information, including those which Defendant misappropriated. These measures include, for example, requiring employees

to sign an HPE Agreement Regarding Confidential Information and Proprietary Developments (ARCIPD), which details confidentiality and non-disclosure obligations of HPE employees, policies including the Confidential Information Policy, HPE's Standards of Business Conduct, and the Open Source Software Program; providing training for Protecting HPE Resources; requiring authenticated user logins and maintain password protection on HPE-managed devices; maintaining web control services and utilizing HPE security tools. HPE cybersecurity monitors HPE systems, including employee devices if they use their own device with the Bring Your Own Device Program. Employees are instructed to "never disable, modify, or bypass any security software or settings" when accessing the "Internet, email, SharePoint, or another application from any device." Ex. 8 (SBC FY25 Module 4 - Headline Test, Conflicts training) at 31.

87. As stated above, HPE's Hero Trade Secrets relate to HPE's products and services used, sold, or purchased, or intended for use, sale, or purchase, across the United States (including HPE's Morpheus Software and solutions offered therein), which are offered and supplied to customers throughout the United States, including numerous customers for numerous projects in this District, as well as throughout the world. In particular, the Hero Trade Secrets are used to improve the Morpheus product that HPE currently provides to customers.

88. Defendant has misappropriated the Hero Trade Secrets including by acquiring the trade secrets by improper means by removing them from HPE's authorized devices and networks. Defendant has also misappropriated the Hero Trade Secrets by disclosing them on a third party repository, GitHub, and further disclosing them through

publication of the materials. Defendant used improper means to acquire and disclose the trade secrets, including by circumventing HPE security measures including specific security platforms and by violating the ARCIPD agreement, failing to obtain approval from HPE's Open Source Review Board before publishing Hero, and disregarding trainings on the importance of maintaining confidentiality. Defendant's actions were without HPE's express or implied consent, and in violation of his agreements described above. These actions constitute a breach of Defendant's duty to maintain secrecy.

89. Defendant misappropriated HPE's trade secrets and confidential information to benefit himself, and to allow himself to unfairly compete against and harm HPE by acquiring and using HPE's trade secrets, including in this District.

90. Defendant acquired, accessed, used, and disclosed, and on information and belief is still using HPE's trade secrets and confidential information in interstate commerce by improper means, without HPE's express or implied consent, and in violation of the agreements described above.

91. Misappropriation of this type of information undermines HPE's competitive position in the market. In particular, Mr. Wheeler instructed HPE employees to use the Hero tool as part of the software development workflow for the Morpheus Software. He then uploaded the hero repository on GitHub under the alias "chet-bellows," and made the Hero Trade Secrets publicly available. The Hero tool can also be used to further exfiltrate HPE data, allowing Mr. Wheeler to use HPE's data and software outside of HPE.

92. Mr. Wheeler knew or had reason to know at the time he acquired, accessed, and used HPE's trade secrets and confidential information that this information is

confidential and was acquired and maintained by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use, including by virtue of his employment agreement and signing the ARCIPD agreement. Mr. Wheeler further knew or had reason to know that this information was developed or acquired by HPE at great expense and effort, that HPE maintains it as confidential, and that it is not generally available to the public or HPE's competitors such that his possession and use of this information would provide significant benefits.

93. Mr. Wheeler's unlawful actions, including the improper acquisition, disclosure, and use of HPE's trade secrets all occurred outside the scope of his employment with HPE and for Mr. Wheeler to gain a competitive benefit against HPE.

94. At no time has HPE consented to Mr. Wheeler's improper acquisition, disclosure, or use of HPE's trade secrets for any reasons unrelated to his employment with HPE.

95. Mr. Wheeler has engaged in the actual and threatened misappropriation of HPE's trade secrets in violation of the DTSA. His actions, as set forth herein, constitute "misappropriation" within the meaning of 18 U.S.C. § 1839(5).

96. On information and belief, Mr. Wheeler has in his possession or control and is using HPE's trade secrets and confidential information to compete with and/or otherwise harm HPE, and such additional acts of misappropriation will be revealed through discovery. Mr. Wheeler committed acts in furtherance of his misappropriation in the United States and in this District, including misappropriation of trade secrets while in this district with knowledge and intent to harm HPE.

97. HPE is also entitled to injunctive relief to protect its confidential information and trade secrets by (1) enjoining Mr. Wheeler from further possessing, using or disclosing HPE's trade secrets and confidential information; (2) enjoining Mr. Wheeler from altering or deleting HPE's trade secrets and confidential information, or any related evidence, outside of an agreed-upon remediation protocol with HPE; and (3) requiring Mr. Wheeler to return to HPE any and all of HPE's trade secrets and confidential information within his possession, custody, or control.

98. The employment agreement that Mr. Wheeler signed with HPE includes the agreement that if Mr. Wheeler "violate[s] this Agreement (particularly the Protective Covenants), HPE will be entitled to pursue (i) injunctive relief by temporary restraining order, temporary injunction, and/or permanent injunction, (ii) recovery of attorney's fees and costs incurred by HPE in obtaining such relief where allowed by law . . . ." The employment agreement also includes a Mutual Agreement to Arbitrate Claims. However, the Arbitration Agreement expressly carves out the injunctive relief sought here and expressly allows HPE to seek relief from this Court:

> ***The Company*** and Employee ***may pursue provisional*** relief as provided by applicable law, including ***temporary and/or preliminary injunctive relief***, ***in a court of competent jurisdiction*** on the ground that an award may be rendered ineffective without provisional relief pending arbitration; provided, however, that all issues of final relief shall continue to be decided through arbitration, and the pursuit of the provisional relief described herein shall not constitute a waiver of the parties' agreement to arbitrate.

Ex. 3 (Wheeler Offer Letter) at 16.

99. Accordingly, HPE's pursuit of the injunctive relief sought by this complaint is not subject to the Arbitration agreement and the request for such relief is not a waiver of the parties' agreement to arbitrate.

100. Finally, Mr. Wheeler's misappropriation of HPE's Hero Trade Secrets has been willful and malicious. HPE is therefore entitled to recover attorneys' fees resulting from Mr. Wheeler's wrongful misappropriation of HPE's trade secrets.

## <u>SECOND CAUSE OF ACTION</u>

### Breach of Contract

101. HPE realleges and incorporates every allegation above in paragraphs 1-98 as fully set forth herein.

102. As described above, on August 13, 2024, Mr. Wheeler executed the binding, valid and enforceable ARCIPD agreements as a condition of employment with HPE.

103. The ARCIPD is supported by adequate legal consideration.

104. HPE adequately performed as required under the ARCIPD.

105. Under the ARCIPD, Mr. Wheeler is obligated to abide by HPE's Confidential Information Policy. These obligations, among others, require Mr. Wheeler to (a) use HPE Confidential Information and trade secrets only in the performance of HPE duties; (b) to hold such information in confidence and trust; and (c) to use all reasonable measures to assure that such information is not disclosed.

106. Mr. Wheeler materially breached his duties by transferring HPE's confidential information not generally known outside of HPE, including to at least one of his personal electronic devices and personal GitHub account with the username "bdwheeler" to work on Hero on GitHub, first in a private repository and then in a public repository under the alias "chet-bellows."

107. Through his publishing of HPE confidential and trade secret information, including through disclosure of the Hero Trade Secrets, Mr. Wheeler breached his agreements with HPE, including by breaching the ARCIPD and incorporated policies.

108. In addition to working on and publishing the Hero Trade Secrets on GitHub, Mr. Wheeler also kept copies of HPE confidential information and trade secrets, including the Hero Trade Secrets, on his own personal computer, additionally breaching the ARCIPD.

109. As a proximate result of Mr. Wheeler's actions, HPE is suffering and will continue to suffer significant and irreparable harm for which HPE has no adequate remedy at law.

110. HPE is entitled to injunctive relief, including temporary and preliminary injunctive relief, to prevent further harm to HPE and to prevent further breaches of the ARCIPD, and for its attorney's fees and costs.

**PRAYER FOR RELIEF**

**WHEREFORE**, HPE prays for relief as follows:

1. Award a temporary restraining order and preliminary and permanent injunctive relief:

   A. Enjoining Defendant from possessing, disclosing, retaining, or using any HPE confidential information or trade secrets in his possession, custody, or control, including the "Hero" tool, proprietary Hero Cloud source files and data, HPE Jira data, and internals of the HPE proprietary Hero Code and Hero Cloud;

   B. Requiring Defendant to preserve all documents, data, devices, communications, and other evidence potentially relevant to the facts and

circumstances of this case, including and not limited to all instances of Hero on any platform, including GitHub;

C. Requiring Defendant to immediately return to HPE, through HPE's undersigned counsel, all HPE confidential information and trade secrets in his possession, custody, or control, including without limitation the Hero Trade Secrets, including to make available to HPE the private repositories containing Hero and, without limitation, its source files, code, all referenced data, and records to determine each access to or download of files from the Hero GitHub repositories;

D. Requiring production by Defendant of all devices and storage media, including cloud accounts, to which he had access from August 14, 2024 to the date of this filing for forensic inspection to determine the full extent to which Defendant unlawfully stored, copied, published, or used HPE Trade Secrets and other confidential HPE information;

2. Recovery of attorney's fees and costs incurred by HPE in obtaining such relief; and
3. Any and all additional relief as the Court deems appropriate.

DATED: October 23, 2026

Respectfully submitted,

*/s/ Christopher M. Lawless*
Christopher M. Lawless
christopher.lawless@kirkland.com
KIRKLAND & ELLIS LLP
2049 Century Park East
Suite 3700
Los Angeles, CA 90067
Telephone: (310) 552-4200
Facsimile: (310) 552-5900

Adam R. Alper
adam.alper@kirkland.com
Laura Vartain Horn
laura.vartain@kirkland.com
Labdhi Sheth Desai
labdhi.shethdesai@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Michael W. De Vries
michael.devries@kirkland.com
KIRKLAND & ELLIS LLP
695 Town Center Drive
Costa Mesa, CA 92626
Telephone: (714) 982-8822
Facsimile: (714) 982-8844

F. Christopher Mizzo
chris.mizzo@kirkland.com
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5200

Laura Kelley Uhlenhuth
laura.uhlenhuth@kirkland.com
KIRKLAND & ELLIS LLP
95 South State Street
Salt Lake City, Utah 84111
Telephone: (801) 877-8090
Facsimile: (801) 877-8101

Kimberly M. Hult
kimberly.hult@hbcboulder.com

Jonathan B. Boonin
jonathan.boonin@hbcboulder.com
Hutchinson Black and Cook, LLC
921 Walnut Street
Suite 200
Boulder, CO 80302
Telephone: (303) 442 6514
Facsimile: (303) 442-6593

*Attorneys for Plaintiff Hewlett Packard Enterprise Company*

## CERTIFICATE REGARDING USE OF ARTIFICIAL INTELLIGENCE (AI)

The undersigned counsel certifies that no portion of this filing was drafted by artificial intelligence.

*/s/ Christopher M. Lawless*
*Attorney for Plaintiff Hewlett Packard Enterprise Company*

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Craig Murray, on behalf of Hewlett Packard Enterprise Company, declare under penalty of perjury that the statements set forth in the foregoing Verified Complaint for Injunctive Relief are true and correct except as where such statements are made upon information and belief.

Dated: October 23, 2026

______________________________